**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JIE QIAO,

c/o North River Law PLLC
1300 I St. NW, Suite 400E
Washington, DC 20005

                Plaintiff,

      v.

PEOPLE'S REPUBLIC OF CHINA,

c/o Ministry of Foreign Affairs of the PRC
No. 2, Chaoyangmen S. St.,
Chaoyang District, Beijing, 100701

c/o Ministry of Justice of the PRC
No. 6 Chaoyangmen S. St.
Chaoyang District, Beijing, 100701

                Defendant.

Civil Action No.: 23-cv-603

**COMPLAINT**

Plaintiff Jie Qiao ("Qiao" or "Plaintiff") brings this action based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, against the People's Republic of China ("PRC" or "Defendant") as follows:

**NATURE OF THE ACTION**

1.    This is a personal injury action arising from an outrageous attack committed against Plaintiff on August 17, 2022, by an unidentified official, employee, or agent ("Doe 1") of Defendant PRC, whose image is reproduced below. As video evidence and medical records show, while Plaintiff was exercising her First Amendment rights, on American soil, by peacefully protesting judicial corruption in the PRC, Defendant, through Doe 1, sought to suppress her rights and end her protest by striking her on the head with a bullhorn, and by blasting the bullhorn's extremely loud siren directly into her ear, causing her to suffer serious physical

injuries, including a seizure, brain hemorrhaging, and leg injuries resulting in Plaintiff requiring the use of a wheelchair. For this unconscionably tortious conduct and extremely dangerous instance of transnational repression, Plaintiff seeks compensatory and punitive damages against the PRC in the amount of $25,000,000.



## JURISDICTION AND VENUE

2.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1330 and 28 U.S.C. § 1605(a) as money damages are sought from a foreign state for personal injury occurring in the United States and caused by the tortious act or omission of that foreign state and of officials, employees, or agents of that foreign state acting within the scope of their office, employment, or agency. And the Court has jurisdiction under 28 U.S.C. § 1367, supplemental jurisdiction, as the remaining claims form part of the same case or controversy.

3.    This Court has personal jurisdiction over the PRC under 28 U.S.C. § 1330(b) and D.C. Code § 13-423(a), as a District of Columbia court may exercise personal jurisdiction over a

person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission in the District of Columbia.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(d), because a substantial part of the unlawful conduct occurred in the District of Columbia.

## PARTIES

### A.     Plaintiff

5.     Plaintiff Jie Qiao, born August 10, 1952, is a lawful permanent resident of the United States, a resident of New York, and a citizen of the PRC. Qiao is not a political activist. Nor is she opposed to the government of the PRC or the Chinese Communist Party ("CCP"). In fact, her father fought for the CCP in the Chinese Civil War. She is, however, opposed to corruption, and is determined to stand up for her rights. That is why she protests the injustice she experienced in the PRC. And it is why she is filing this action.

### B.     Defendant

6.     Defendant PRC is a foreign state. At all times relevant herein, the PRC acted through and is responsible for the tortious acts or omissions of its officials, employees, and agents acting within the scope of their office, employment, and agency. In this case, the PRC's officials, employees, and agents include, but are not limited to, former ambassador Qin Gang, the staff at the ambassador's residence, and Doe 1.

## STATEMENT OF FACTS

7.     Plaintiff was an entrepreneur in the PRC. She first came to the United States in 2012 and established residency in 2014 before obtaining permanent residency in 2018.

8.     In 2007, in the PRC, Plaintiff obtained a judgment against a company named Wuhan Blue Moon Bay Mountain Villa Ltd. Co. ("Blue Moon") in a contract dispute relating to construction materials. In 2008, while executing that judgment, it was discovered that Blue

Moon had rights to approximately 69 *mu* of land (just over 11 acres) in a village called Qianfeng, and the Wuhan Hongshan District People's Court awarded to Plaintiff leasehold rights in 20 *mu* of that land (just over 3 acres). Plaintiff then invested about 2 million RMB (just under $300,000) in preparation for applying the land to a mushroom-growing business.

9.    However, towards the end of 2009, officials in Qianfeng village colluded with local businesses to corruptly expropriate 31.5 *mu* of land, including Plaintiff's 20 *mu*, as well as land belonging to Blue Moon, and illegally developed real estate on top of that land. Plaintiff reported their corruption, which eventually led to criminal proceedings being brought against several dozen individuals.

10.    As for Plaintiff's leasehold rights, Plaintiff initiated judicial proceedings in the same court that had awarded her those rights in the first place, the Hongshan People's Court, this time against the corrupt officials and businesses that had colluded to deprive her of those rights. But what ensued was a Kafkaesque ordeal in which the Hongshan People's Court first dismissed her case for lack of jurisdiction, and then on the bizarre ground that she should seek redress against Blue Moon for the loss of her leasehold rights, despite the fact that Blue Moon was *also* a victim of the corrupt scheme that resulted in that loss. Both times, Plaintiff was able to successfully appeal and win reversals of the dismissals.

11.    In 2015, on her third attempt to get the Hongshan People's Court to hear her case, an appraisal was conducted of Plaintiff's leasehold rights in the 20 *mu*, which found that those rights were worth 3.8 million RMB (approximately $550,000).

12.    Not long after, however, and without explanation, the Hongshan People's Court suspended the proceedings. A year and a half after that, in 2017, it suddenly and without warning

dismissed Plaintiff's case yet again, this time on the truly absurd ground that the 2008 ruling that had awarded her rights in the 20 *mu* in the first place had been unlawful.

13.    Given the Hongshan People's Court's substantively bizarre and procedurally irregular rulings against her, Plaintiff's strong suspicion is that the judges had either been bribed into ruling against her or were otherwise ruling against her for corrupt reasons unrelated to the merits of her position. And after the 2017 dismissal, possibly to prevent a scandal in this regard, or for other corrupt reasons, the appellate courts were also no longer of any help.

14.    Throughout this saga, Plaintiff had regularly traveled from the United States to the PRC to personally advocate for her cause, including directly to officials with responsibility for her case. In other words, she became what in the PRC is known as a "petitioner," that is, someone who petitions the government, usually the central government, for redress of grievances, usually against local authorities. In 2019, she did so again, but was unsuccessful.

15.    This time, however, when she tried to return to the United States, she was told at the Shanghai airport that she had been banned by authorities from leaving the PRC. Through discussions with the Ministry of State Security, she learned that the ban had been obtained in an irregular manner that left no paper trail, but that it had apparently been instituted by a court, the identity of which the MSS declined to share with her. The MSS advised her that they would lift the ban and that she should drop the matter and leave the PRC as soon as possible, which she did. She has not returned to the PRC since.

16.    At some point during her petitioning activity, Plaintiff learned that her grandchildren had been prevented from attending school by authorities, presumably as a way to pressure her to stop petitioning. Plaintiff thus arranged for her family to leave the PRC and join her in the United States.

17.     Back in the United States, Plaintiff continued her efforts to obtain justice. Plaintiff began petitioning the PRC ambassador for assistance in dealing with the corruption that had robbed her of her property. Plaintiff's efforts included peacefully protesting that injustice in the area in front of the ambassador's residence at 2301 S Street NW, Washington, DC, 20008, as was her right under international and domestic law. At the time, the ambassador was Qin Gang, who is now the PRC foreign minister.

18.     On August 17, 2022, Plaintiff was peacefully protesting on the sidewalk adjacent to the ambassador's residence, along with other petitioners who, like Plaintiff, had grievances arising from injustices they'd experienced in the PRC. In general, the petitioners used various peaceful means to call on the ambassador to live up to various promises made by the PRC government and help them obtain redress for the injustices they'd suffered. To ensure their messages were heard, Plaintiff and her fellow petitioners sometimes issued them using bullhorns. Plaintiff and her fellow petitioners had engaged in similar protests before, without serious incident.

19.     Below is an image of Plaintiff before the incident giving rise to this action occurred. As can be seen, Plaintiff is able to stand and is peacefully protesting. Indeed, all Plaintiff was saying at the time was that then-ambassador Qin Gang should meet with the petitioners, as well as summarizing the injustice she'd experienced in the PRC that had led her to become a petitioner in the first place.



20.     On that day, however, the ambassador's staff had apparently decided not to tolerate Plaintiff and her fellow petitioners any longer. Behaving with the kind of impunity they may have been accustomed to in the PRC, a group of determined staff members, including Doe 1, emerged from the residence and headed for Plaintiff and her fellow petitioners, instigating an altercation. Like some of the petitioners, the ambassador's staff members also carried bullhorns. However, unlike the petitioners, the ambassador's staff members used their bullhorns as weapons, as illustrated in more detail below.

21.     Plaintiff, being older with pre-existing health problems, and wanting to avoid confrontation, moved away from the incoming staff members. Nevertheless, as can been seen in the image below, Doe 1 decided to track her down:



22.     Doe 1's intent in tracking Plaintiff down was to attack her using his bullhorn, as the image below makes clear:



23.     At this juncture, Plaintiff began feeling fear and anxiety, as well as pain from the extremely loud siren blaring into her ear. Plaintiff tried to parry the bullhorn away in self-defense,

but Doe 1 persisted in attacking her with it. Eventually, though the moment was not caught on camera, Doe 1 physically struck Plaintiff on the head with the bullhorn, causing Plaintiff to collapse. In total, Doe 1's attack on Plaintiff lasted 10 to 15 seconds. The immediate aftermath of Doe 1's attack on Plaintiff can be seen in the below image, where Plaintiff can be seen on the ground:



24.     As officers on the scene and fellow petitioners noticed her on the ground, Plaintiff developed a severe headache and blurred vision, which concerned Plaintiff because she had pre-existing medical conditions, including a heart condition, as well as cavernous angioma, a malformation of blood vessels that can result in seizures, with which she was diagnosed in 1996, and for which she took anti-epileptics. Plaintiff thus reached for her medical records, which she generally carried with her, and gave them to a U.S. Secret Service officer at the scene. She also explained that she had been struck on the head, as indicated in the below image:



25.     Plaintiff's heart then started to beat so fast that she was worried she would have a heart attack, so she took out a pill bottle containing her heart medication. But because her hands were shaking uncontrollably by that point, a fellow petitioner had to open the bottle and feed the mediation to her, as shown in the image below:



26.     Soon thereafter, Plaintiff had a seizure for the first time in several years. Around the same time, Plaintiff became extremely confused. Also around the same time, paramedics arrived to take her to MedStar Georgetown University Hospital. Below is an image of Plaintiff being treated by paramedics at the scene:



27.     At the hospital, Plaintiff underwent a CT scan and MRI. The CT scan revealed a right frontal lobe hemorrhage concerning for hemorrhagic contusion. The MRI was also revealed a hemorrhagic brain contusion. Medical providers assessed that Plaintiff's underlying cavernous angioma may have bled acutely due to trauma. Plaintiff was diagnosed with "Mild Traumatic Brain Injury 2/2 head strike"; "Hemorrhagic Contusion vs Bleeding Cavernoma 2/2 Hemorrhage"; and "Post-traumatic generalized tonic-clonic seizure."

28.     Plaintiff was hospitalized for 23 days (August 17 to September 9), including 7 days in the neuro ICU. During the time Plaintiff was in the neuro ICO, Plaintiff suffered a headache so severe she felt like her head would explode.

29.     Doe 1's conduct has also caused Plaintiff to lose significant function in her left leg, suffer chronic pain in that leg, and to require the use of a wheelchair to this day.

30.     Doe 1's conduct has also caused Plaintiff to suffer severe and frequent headaches, as well as psychological trauma.

31.     Doe 1's conduct has also caused Plaintiff to suffer noise-induced ear pain, tinnitus, and increased sensitivity to sound.

32.     Below is a picture of Plaintiff in the hospital:



33.     Below is a picture of the wheelchair-bound Plaintiff a few months after her release from the hospital:



34.    Doe 1's attack on Plaintiff was premeditated and part of a plan to silence Plaintiff and her fellow petitioners. Indeed, the images below show that the ambassador's staff kept six bullhorns in the garage for exactly this purpose:





35.    And the images below show Doe 1 and other members of the ambassador's staff using these bullhorns as weapons against other petitioners:











36.     The model of the bullhorns used by the ambassador's staff members is believed to be the Pyle Megaphone 50-Watt Siren Bullhorn – Professional Outdoor Voice for Police & Cheerleading - PMP57LIA.

37.     Doe 1 and the other members of the ambassador's staff who attacked Plaintiff and petitioners that day emerged from the ambassador's residence, and, as can be seen in the image below, returned to the residence after the altercation ended. They were employees or agents of the PRC. Moreover, given that the bullhorns they used were stored in the ambassador's garage, their conduct in attacking Plaintiff and her fellow petitioners was clearly within the scope of their employment.



## FIRST CLAIM FOR RELIEF
### Assault

38.     Plaintiff re-alleges and incorporates all the allegations of this complaint with the same force and effect as if fully restated herein.

39.     At all times relevant herein, Defendant PRC acted through its employees, officers, and agents, including Doe 1, who were acting within the scope of their office or employment.

40.     Defendant's employees, officers, and agents, including Doe 1, acted intentionally to cause harmful and offensive contact to Plaintiff.

41.     Defendant's employees, officers, and agents, including Doe 1, caused Plaintiff to imminently fear or apprehend such harmful, offensive and unlawful contact.

42.     Defendant's employees, officers, and agents, including Doe 1, acted with the intent to threaten and harm, and did threaten and harm Plaintiff.

43.     In doing all this, Defendant's employees, officers, and agents, including Doe 1, were motivated by a desire to repress Plaintiff's right to free speech and expression in the United States.

44.     Plaintiff did not consent to such conduct, which caused physical, mental, and emotional injury, damage, loss, and harm to Plaintiff.

45.     As a result of the foregoing, Plaintiff demands judgment against Defendant in the amount of $25,000,000, which includes compensatory and punitive damages, as well as attorneys' fees and costs and pre-judgment interest.

## SECOND CLAIM FOR RELIEF
### Battery

46.     Plaintiff re-alleges and incorporates all the allegations of this complaint with the same force and effect as if fully restated herein.

47.     At all times relevant herein, Defendant PRC acted through its employees, officers, and agents, including Doe 1, who were acting within the scope of their office or employment.

48.     Defendant's employees, officers, and agents, including Doe 1, acted intentionally to cause harmful and offensive contact to Plaintiff, including by blasting an extremely loud siren in Plaintiff's ear using a bullhorn, *e.g.*, *Eichenwald v. Rivello*, 318 F. Supp. 3d 766, 775 (D. Md. 2018) ("[I]f a person used a laser to intentionally blind another, or a sonic weapon to intentionally cause permanent hearing loss," that would constitute "a battery, even though the

contact at issue was 'only' a beam of light or a sound wave."), and by striking Plaintiff on the head using that bullhorn.

49.     In doing all this, Defendant's employees, officers, and agents, including Doe 1, were motivated by a desire to repress Plaintiff's right to free speech and expression in the United States.

50.     Plaintiff did not consent to such conduct, which caused physical, mental, and emotional injury, damage, loss, and harm to Plaintiff.

51.     As a result of the foregoing, Plaintiff demands judgment against Defendant in the amount of $25,000,000, which includes compensatory and punitive damages, as well as attorneys' fees and costs and pre-judgment interest.

### THIRD CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

52.     Plaintiff re-alleges and incorporates all the allegations of this complaint with the same force and effect as if fully restated herein.

53.     At all times relevant herein, Defendant PRC acted through its employees, officers, and agents, including Doe 1, who were acting within the scope of their office or employment.

54.     Defendant's employees, officers, and agents, including Doe 1, recklessly or intentionally caused severe emotional distress to Plaintiff by their willful, wanton, extreme, and outrageous conduct, including but not limited to blasting an extremely loud bullhorn in Plaintiff's ear, and using that bullhorn to attack Plaintiff, all because Plaintiff was exercising her rights to free speech and expression on U.S. soil.

55.     This conduct was so outrageous in character and so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and as being utterly intolerable in a civilized community.

56.     As a direct and proximate result of this conduct, Plaintiff suffered pain, severe emotional distress, and mental anguish.

57.     As a result of the foregoing, Plaintiff demands judgment against Defendant in the amount of $25,000,000, which includes compensatory and punitive damages, as well as attorneys' fees and costs and pre-judgment interest.

**FOURTH CLAIM FOR RELIEF**
**Civil Claim for Prejudice-Motivated Injury under D.C. Code § 22-3704**

58.     Plaintiff re-alleges and incorporates all the allegations of this complaint with the same force and effect as if fully restated herein.

59.     At all times relevant herein, Defendant PRC acted through its employees, officers, and agents, including Doe 1, who were acting within the scope of their office or employment.

60.     Defendant's employees, officers, and agents, including Doe 1, injured Plaintiff as a result of their prejudice against Plaintiff's actual or perceived political affiliation.

61.     As a direct and proximate result of this conduct, Plaintiff suffered physical, mental, and emotional injury, damage, loss, and harm.

62.     As a result of the foregoing, Plaintiff demands judgment against Defendant in the amount of $25,000,000, which includes compensatory and punitive damages, as well as attorneys' fees and costs and pre-judgment interest.

**FIFTH CLAIM FOR RELIEF**
**Civil Conspiracy**

63.     Plaintiff re-alleges and incorporates all the allegations of this complaint with the same force and effect as if fully restated herein.

64.     At all times relevant herein, Defendant PRC acted through its employees, officers, and agents, including Doe 1, who were acting within the scope of their office or employment.

65.     Defendant's employees, officers, and agents, including Doe 1, conspired to assault, batter, intentionally inflict emotional distress upon, and cause prejudice-motivated injury to Plaintiff.

66.     Overt acts in furtherance of the conspiracy include collecting bullhorns stored at the ambassador's residence for the purpose of the conspiracy; emerging from the ambassador's residence in a coordinated manner; blasting that bullhorn in Plaintiff's ear; and using that bullhorn to attack Plaintiff.

67.     As a direct and proximate result of the conspiracy, Plaintiff suffered physical, mental, and emotional injury, damage, loss, and harm.

68.     As a result of the foregoing, Plaintiff demands judgment against Defendant in the amount of $25,000,000, which includes compensatory and punitive damages, as well as attorneys' fees and costs and pre-judgment interest.

## PRAYER FOR RELIEF

Plaintiff hereby demands:

A.      Damages in the amount of $25,000,000, which includes compensatory and punitive damages;

B.      Pre-judgment interest;

C.      Plaintiff's attorneys' fees and costs; and

D.      Such other and further relief, including any additional equitable relief, as the Court may deem just and proper.

Dated: March 6, 2023              By: *Times Wang*              
**NORTH RIVER LAW PLLC**
Times Wang (D.C. Bar 1025389)
1300 I St. NW, Suite 400E
Washington, DC 20005
(202) 838-6489
twang@northriverlaw.com

*Counsel for Plaintiff*